UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

TANYA M. MARTIN, Administratrix of   )      Case No.: 1:08 CV 2165
the Estate of William Parker Martin, *et. al.*,   )
                                )
       Plaintiffs             )
                                )
       v.                   )       JUDGE SOLOMON OLIVER, JR.
                                )
CITY OF BROADVIEW HEIGHTS, *et al.*,   )
                                )
       Defendants         )       <u>ORDER</u>

       Tanya M. Martin, individually, and as Administratrix of the Estate of William Parker Martin

("Plaintiffs") brought the above captioned action against the City of Broadview Heights, *et al.*,

("Defendants" ) alleging both federal and state claims. (ECF No. 1, Attach. 1.) Defendants move for

summary judgment against all Plaintiffs' claims.  (ECF. 51.)  For the following reasons, the court

grants in part and denies in part Defendants' motion.

## I. FACTUAL HISTORY

### A. Arrest of the Decedent, William Parker Martin

       This case arises from the arrest of William Parker Martin on August 16, 2007.  According

to Plaintiffs' complaint, opposition, and supporting documents, the following events occurred on

that day. Shortly after 2:00 a.m., the City of Broadview Heights Police Department dispatched police

officers to 1000 Tollis Parkway, City of Broadview Heights, in response to a call indicating that a

male, wearing only jeans, was yelling for help. (Compl. ECF No. 1; *See also*, Mot. Summ. J., ECF

No. 51.) Officers Ryan Tieber ("Defendant Tieber"), Scott Zimmerman ("Defendant Zimmerman"),

Michael Semanco ("Defendant Semanco"), (collectively referred to as "Defendant Officers"), and Robert Novotny ("Defendant Novotny"), responded to the dispatch.  On their way to 1000 Tollis Parkway, Defendants were informed that a naked male had entered into an elderly woman's apartment and had subsequently left the area.

Defendant Tieber was the first officer to encounter William Parker Martin ("the decedent"), who, now completely naked, was running away from the condominium unit. (Pls. Opp, ECF No. 53.) On viewing the decedent, Defendant Tieber stopped his patrol car. At this moment, the decedent ran in the direction of Defendant Tieber rambling "you've got to help me". ( Pls. Opp. Appendix, Tieber Dep. ECF No 54, Attach. 3.) The decedent then placed his hands behind his back and stated to Defendant Tieber, "take me to jail." (*Id*.) Defendant Tieber attempted to handcuff the decedent and placed his left hand onto the decedent's hands. (*Id*.) The decedent jerked away from Defendant Tieber and ran away. *(Id*.) Defendant Tieber pursued the decedent on foot, grabbed the decedent's arms from behind, and brought the decedent to the ground in a face down or prone position.  (*Id*.) At this point, Defendant Tieber was lying on top of the decedent, his stomach to the decedent's back, in an attempt to keep the decedent from fleeing. *(Id*.) While the decedent was still in a prone position with Defendant Tieber on his back, Defendant Semanco arrived at the scene and fell on top of both Defendant Tieber and the decedent forcing his knee into the decedent's left side. (*Id*.) Defendant Semanco hit the decedent's side with "one, two at most" "compliance body shot[s]". *(Id*.)  During the struggle,  the decedent bit down on Defendant Tieber's first knuckle; in response, Defendant Tieber delivered two left-handed punches to the decedent's face. (*Id*.) Once his finger was free from the decedent's mouth,  Defendant Tieber positioned himself so that his legs were around the decedent's hips and his right arm was wrapped around the decedent's chin. *(Id*.) When Defendant

-2-

Zimmerman arrived at the scene, he kneeled on the back of the decedent's calves to prevent the decedent from kicking the other officers and himself. ( Pls. Opp. Appendix, Zimmerman Dep. ECF No. 54, Attach. 5.) The decedent remained in a face down position during this time. At the time of the incident the decedent was 5'10" and weighed 172 pounds, while Defendant Tieber weighed approximately 180 pounds, Defendant Semanco weighed approximately 185 to 195 pounds, and Defendant Zimmerman weighed approximately 245 pounds. (App. Opposition, Tieber Dep.,  Attach. 3, Semanco Dep., Attach.  4, and Zimmerman Dep., Attach. 5.)

When Defendant Novotny arrived at the scene, the decedent, in a face down position, was being handcuffed. Defendants Novotny and Semanco subsequently left the scene  and Defendant Zimmerman took Defendant Semanco's position in restraining the decedent on his right side. (App. Opposition, Attach. 5.)  Defendants Zimmerman and Tieber continued to hold the decedent in a face down position until the decedent made a "gurgling noise." (*Id.*) In reaction to the decedent's noise, the officers rolled the decedent on his left side and saw that he was unresponsive. (*Id.*)

### B. The Decedent's Cause of Death

The decedent was taken to the Emergency Room and was pronounced dead at 3:06 a.m. Dr. Stanley Seligman of the Cuyahoga County Coroner's Office ("Dr. Seligman") conducted the decedent's autopsy and found a number of injuries consistent with death by asphyxiation. ( Pls. Opp. Appendix, Seligman Dep.,  Attach. 6.) The Coroner's Verdict Report, written by Dr. Frank Miller, III ("Dr. Miller"), stated that the cause of death was a result of "acute psychotic episode with excited delirium, due to: acute intoxication by lysergic acid diathylamide[1], and another condition of: cardiopulmonary arrest during police activity, and was homicidal in nature." (*Id.* Pls. Ex. 50.)

_____

[1] Colloquially known as "LSD" or "acid".

Three months after Dr. Seligman performed the autopsy, he contacted Coroner Investigator Alan Clark ("Clark") and asked Clark to perform an investigation into the incident because he had some concerns that the decedent may have died as a result of asphyxiation during Defendant Officers restraint and arrest of the decedent. (*Id*.)  After Dr. Seligman reviewed Clark's investigation report, he concluded that the report contained "compressive events" or actions committed by Defendants Tieber and Semanco that could have caused the decedent's asphyxiation, and that the gurgling noise made by the decedent was consistent with asphyxiation. (*Id*.) In his deposition, Dr. Seligman agreed that despite the Coroner's Verdict of "acute intoxication . . .  and cardiopulmonary arrest," the principal cause of the decedent's death was likely asphyxiation. (*Id*.)

Plaintiffs also proffer the expert report of Dr. Werner Spitz, a pathologist, who determined that Defendant Officers' conduct caused the decedent's death by asphyxiation. ( Pls. Opp. Appendix, Spitz Dep., Attach. 17.)

### C. Police Department's Policy and Training Regarding  Positional Asphyxia

At the time of the decedent's arrest, the Police Department had a Use of Force Policy that applied to police officers' restraint of suspects or detainees. ( Pls. Opp. Appendix, Lipton Dep., ECF No. 54, Attach. 8.) In addition to this policy, in  2003, the Police Department instituted a Positional Asphyxia Policy that informed police officers of the dangers of asphyxiation when restraining an individual. ( Pls. Opp. Appendix Positional Asphyxiation Policy, ECF No. 54, Attach. 11.)  Besides giving the medical definition and symptoms of asphyxiation, the Asphyxia Policy further describes individuals who are at high risk for suffering from asphyxiation. (*Id*.) These "High Risks Subjects" include those individuals who are psychotic due to mental illness or the ingestion of drugs or alcohol. (*Id*.) The Asphyxia Policy states, in pertinent part:

> Many individuals who suddenly die after being restrained have exhibited bizarre, irrational, agitated behavior, including a violent struggle with officers who are trying to restrain them, often with what seems like superhuman strength. This condition is sometimes referred to as Excited or Agitated Delirium. It can result from the use of alcohol or drugs or from mental illness.

(*Id.*)

In their depositions, Defendants Tieber, Semanco, Zimmerman, and Chief Lipton stated that the Use-of-Force and Positional-Asphyxia training consisted of reviewing the policies and that the Police Department did not facilitate any hands-on training specific to these policies. ( Pls. Opp. Appendix, ECF No. 54, Tieber Dep., Attach. 3, Semanco Dep., Attach. 4, Zimmerman Dep., Attach. 5 and Lipton Dep., Attach. 8.)  Defendant Chief Lipton stated that the Police Department facilitated mandatory reviews of the Use-of-Force Policy by having a range qualifier read the policy to officers during their re-qualifications. (ECF No. 54, Lipton Dep., Attach. 8.) Defendant Tieber stated that the officers typically reviewed the Positional Asphyxia Policy by reading the policy out loud to each other, but he could not remember the last time he reviewed the Policy prior to the decedent's arrest. (Opposition and 54-3.)  Defendant Semanco testified that he had no training with respect to handling "High Risks Subjects" under the Positional Asphyxia Policy or with respect to how an officer de-escalates confrontations with mentally disturbed individuals. (App. Opposition, ECF No. 54, Semanco Dep., Attach. 4.) Both Defendant Officers testified that they never thought of utilizing the Asphyxia Policy during their arrest of Plaintiff.  (*Id.*, Tieber Dep. Attach. 3, Semanco Dep., Attach. 4.) Plaintiff's expert R. Paul McCauly, Ph.D, FACFE[2], ("Dr. McCauly") who specializes in the field of police practices, found a number of failures on the part of the Police Department's training,

---

[2]       Dr. McCauly is a Fellow with the American College of Forensic Examiners, here FACFE.

including the Department's failure to properly train officers with respect to the Positional Asphyxia Policy and its failure to properly investigate use of force violations. (*Id*. McCauley Aff., Attach. 2.) Dr. McCauly also found that the Police Department did not have an Emotional[3] Disturbed Person Policy. (*Id*. at 5.) Dr. McCauly concluded that if the Department had followed accepted police operational policies the decedent's death, more than likely, would have been avoided. (*Id*.)

### D. Internal Investigations of Defendant Officers' Use of Force

Prior to the decedent's arrest, Defendants Tieber and Semanco had been involved in incidents where their use of force was questioned.  An excessive-force complaint was filed against Defendant Tieber for his use of force in an arrest. ( Pls. Opp. Appendix, ECF No. 54, Tieber Dep., Attach. 3.)  In terms of the decedent's arrest and subsequent death, there has been no internal investigation by the Police Department into Defendant Tieber's use of force against the decedent. (*Id*.) Further, Defendant Semanco was involved in several use of force incidents, including one arrest where Semanco broke the nose of the suspect. (*Id*. Semanco Dep., Attach. 4.)  Conducting a performance review of Defendant Semanco, Sgt. Ivanovic of the Police Department concluded that Semanco's personality was not suited for  being a police officer as evidenced by several citizen complaints against Semanco and his use-of-force incidents. (*Id*. Semanco Performance Review, Attach. 13) Sergeant Ivanovic further questioned whether Defendant Semanco's complete inability to operate with little or no supervision led to the violation of "rules, laws and the civil rights of persons". (*Id*.)

### II. PROCEDURAL HISTORY

---

[3] "Emotional" was the term used within the name of the policy.

On September 9, 2008, Tanya M. Martin, as administratrix of the estate of William Parker Martin and in her individual capacity, filed a complaint against the following Defendants: (1) Defendant City of Broadview Heights ("City of Broadview Heights" or "City"); (2) Defendant City of Broadview Heights Police Department ("Police Department"); (3) Defendant Ryan Tieber("Defendant Tieber"); (4) Defendant Scott Zimmerman ("Defendant Zimmerman"); (5) Defendant Rob Novotny ("Defendant Novotny"); (6) Defendant Police Chief Robert Lipton ("Defendant Chief Lipton"); (7) Defendant Lt. Steve Kopniske ("Defendant Lt. Kopniske"); (8) Defendant Sgt. Tim Scarbrough ("Defendant Sgt. Scarbrough"); and (9) Defendants John Doe I, II, and/or III as employees and/or agents of the City and Police Department ("John Does"). (ECF No 1.)

In their complaint, Plaintiffs pled thirteen claims against the following Defendants: (1) Count One:  Assault against Defendants Tieber, Semanco, Zimmerman, and/or Novotny; (2) Count Two: Battery against Defendants Tieber, Semanco, Zimmerman, and/or Novotny; (3) Count Three: Deprivation of Civil Rights: Unreasonable Seizure, Unreasonable/Unnecessary/Excessive Force against Defendants Tieber, Semanco, Zimmerman, and/or Novotny; (4) Count Four: Unlawful Restraint against Defendants Tieber, Semanco, Zimmerman, and/or Novotny; (5) Count Five: Negligence against  Defendants Tieber, Semanco, Zimmerman, and/or Novotny; (6) Count Six: Negligent Hiring/Training/Supervision against Defendants City, Police Department, Chief Lipton; Lt. Kopniske, and Sgt. Scarbrough;  (7) Count Seven: Loss of Consortium against all Defendants; (8) Count Eight: Vicarious Liability/Respondeat Superior against the City; (9) Count Nine: Infliction of Emotional Distress all Defendants;  (10) Count Ten:  Supervisory Liability against Defendants Tieber, Semanco, Zimmerman, Novotny, Chief Lipton, Lt. Kopniske, and Sgt. Scarbrough; (11)

-7-

Count Eleven: Wrongful Death against all Defendants; (12) Count Twelve: Survivorship against all Defendants; and (13) Count Thirteen: Punitive Damages against all Defendants. (Compl. ECF No. 1.)

On June 15, 2010, Defendants filed their motion for summary judgment on Plaintiffs' thirteen claims. (ECF No. 51.) On July 15, 2010, Plaintiffs filed their opposition to Defendants' motion for summary judgment. On August 2, 2010, Defendants filed their reply brief in support of their motion for summary judgment. (ECF No. 56.)

### III. STANDARD OF REVIEW

Summary judgment is appropriate when there is no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (quoting Fed. R. Civ. P. 56(c)). The moving party has the burden of showing the absence of any genuine issues of material facts:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," if any, which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex Corp.*, 477 U.S. at 323 (quoting Fed. R. Civ. P. 56(c)). In reviewing summary judgment motions, this court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 153 (1970); *White v. Turfway Park Racing Ass'n. Inc.*, 909 F.2d 941, 943-44 (6th Cir. 1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248 (1986). Because a determination of whether a factual issue is "genuine" requires consideration of applicable evidentiary standards, the court must decide "whether

reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id*. at 252.  However, "[c]redibility judgments and weighing of the evidence are prohibited during the consideration of a motion for summary judgment." *Ahlers v. Scheibil*, 188 F.3d 365, 369 (6th Cir. 1999).

"[T]he trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)). The non-moving party is under an affirmative duty to show specific facts, within the record, that create a genuine issue of material fact. *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992).  The non-moving party must show "more than a scintilla of evidence to overcome summary judgment"; it is not enough to show that there is slight doubt as to a material fact. *Id*.

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

Fed. R. Civ. P. 56(e).

## IV. LEGAL ANALYSIS

Plaintiffs bring both federal and state claims against Defendants.  Individual Defendants move this court to grant summary judgment in their favor on all of Plaintiffs' claims on the basis that they, as state actors, are immune from suit or, in the alternative, that Plaintiffs' claims fail on their merits.  Municipal Defendant, City of Broadview Heights, moves for summary judgment on the ground that it can not be shown to have violated any of Plaintiffs' constitutional rights.

## A. Federal Claims

Plaintiffs plead four federal claims pursuant to 42 U.S.C. § 1983: Count Three Deprivation of Civil Rights: Unreasonable Seizure; Unreasonable/Unnecessary/Excessive Force; Count Four: Unlawful Restraint; Count Six: Negligent Hiring/Training/Supervision; and Count Ten: Supervisory Liability. Plaintiffs allege: that Defendants Tieber, Semanco, Zimmerman, and/or Novotny are liable under Counts Three and Four; that the City, Police Department, Chief Lipton, Lt. Kopniske, and Sgt. Scarbrough are liable under Count Six; and that Defendants Tieber, Semanco, Zimmerman, Novotny, Chief Lipton, Lt. Kopniske, and Sgt. Scarbrough are liable under Count Ten. The court finds that the Police Department is not a proper defendant because it is not an entity separate from the City.

### 1. Qualified Immunity as Affirmative Defense for Individual Defendants

Section 1983 permits actions seeking damages for constitutional violations committed by persons acting under color of state law. 42 U.S.C. § 1983. A defendant state actor faced with this claim may raise a qualified immunity defense to shield him or herself from liability. *See Harlow v. Fitzgerald*, 457 U.S. 800 (1982). To overcome this defense, a plaintiff must show that: (1) a federal right was violated; (2) that this right was clearly established at the time of the violation such that a reasonable officer would have understood that his or her behavior violated that right; and (3) whether the plaintiff has alleged sufficient facts, and supported the allegations by sufficient evidence, to indicate that what the defendant allegedly did was objectively unreasonable in light of clearly established constitutional rights. *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999).

### a. Count Four: Unlawful Restraint

For an unlawful-restraint claim to survive summary judgment, Plaintiffs must show that the arresting officers and Defendant Novotny lacked probable cause to arrest the decedent. *See Sykes v.*

-10-

*Anderson*, 625 F.3d 294, 305 (6th Cir. 2010). Probable cause "is defined as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *United States v. McClain*, 444 F.3d 556, 562 (6th Cir. 2005) (internal quotation marks omitted).  For this analysis, a court looks at "the facts and circumstances within the police officer's knowledge that are sufficient to warrant a prudent person in believing that a suspect has committed [an offense]. . . ." *Hinchman v. Moore*, 312 F.3d 198, 204 (6th Cir. 2002). Defendants contend that the Officers had probable cause to arrest the decedent because of the multiple 911 calls made about the decedent and the observations of Defendant Tieber, who was the first officer to encounter the decedent. (Mot. Summ. J., ECF No. 51, at 7.)  The court finds that Defendants have met their initial burden of  showing Defendant Officers had probable cause to arrest the decedent. A prudent person could believe that the decedent committed an offense based on both the 911 calls, describing the decedent as half-clothed yelling for help, and subsequently entering into an elderly woman's home, and Defendant Tieber's observations of the decedent's erratic behavior. Plaintiffs, as the non-moving party, have not offered sufficient evidence to show that Defendant Officers lacked probable cause in arresting the decedent.  Based on the evidence presented  for summary judgment, Defendant Officers did not violate the decedent's constitutional right to be free from unlawful restraint. The court grants summary judgment in favor of Defendants on this count.

### b. Count Three: Deprivation of Civil Rights: Unreasonable Seizure; Unreasonable/Unnecessary/Excessive Force

For an excessive-force claim, the court must take into account the particular facts of the case, *Marvin v. City of Taylor*, 509 F.3d 234, 245 (6th Cir. 2007), to determine whether the officers use of force was objectively reasonable. *See Floyd v. City of Detroit*, 518 F.3d 398, 405 (6th Cir. 2008). The "objective reasonableness standard . . . depends on the facts and circumstances of each case

-11-

viewed from the perspective of a reasonable officer on the scene and not with 20/20 hindsight." *Dunn v. Matatall*, 549 F.3d 348, 353 (6th Cir. 2008). This standard must consider the information the officers actually possessed at the time of the use of force, *Anderson v. Creighton*, 483 U.S. 635, 641 (1987), and thus, recognizes that officers are forced to make "split-second judgments" regarding the need and amount of force used. *Graham v. Conner*, 490 U.S. 386, 396 (1989). Thus, a court considering an officer's use of force needs to perform an inquiry that carefully balances "the nature and quality of the intrusion on the [suspect's] Fourth Amendment interests against the countervailing governmental interests at stake." *Id*. at 396 (internal quotation marks omitted). Finally, in circumstances when an unarmed detainee is emotionally disturbed, a court must take into account the detainee's diminished capacity when assessing the reasonableness of the officer's force. *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 904 (6th Cir. 2004) (citing *Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001)).

### i. Defendant Novotny

Defendant Novotny did not participate in the arrest of the decedent, and did not exert physical force upon the decedent. Therefore, Defendant Novotny could not be said to have violated Plaintiffs' constitutional rights. (Mot. Summ. J., ECF No. 51.)

### ii. Defendants Tieber, Semanco, and Zimmerman

Defendants contend that Defendant Officers' use of force was constitutionally permissible in light of the following: the decedent's "dangerous criminal activity" of breaking into an apartment; and the decedent's request to be taken to jail but then physically resisting his arrest. (Mot. Summ. Judgment, 8.) In light of Defendants' arguments, the court must determine whether the Defendant

-12-

Officers' use of force was objectively reasonable against the decedent who exhibited signs of being emotionally disturbed.

### (1) Evidence of Constitutional Violation

Taken in the light most favorable to Plaintiffs, the facts presented on summary judgement establish that a constitutional violation occurred. According to these facts, for a period of time, Defendant Tieber laid on top of the decedent's back, and that once other Defendant Officers arrived at the scene, these Officers aided Tieber in holding the decedent face down by locking the decedent's hips and arm with their bodies. Three Officers then held down the decedent pressing their combined weight on the decedent's back, hips, arms, and calves.  Further, the Officers struck and punched the decedent at most eight times on his side, ribs, and face to prevent him from getting up. After some time had passed, Defendant Zimmerman turned the decedent, lying face down, to his left side because he heard the decedent make a "gurgling sound." The facts also indicate that the decedent was exhibiting signs that he was emotionally disturbed: he was naked, acting erratically, and yelling for help. Defendant Tieber describes the decedent as being in an "excited, agitated state." A reasonable officer would have known that the decedent was likely under the influence of drugs or emotionally ill, and thus would have adjusted the application of force accordingly.  Thus, there exists evidence that when viewed in the light most favorable to Plaintiffs, indicates that Defendant Officers committed a constitutional violation when they restrained the decedent.

### (2) Violation of Clearly Established Constitutional Rights

The right to be free from unreasonable seizures and excessive force was clearly established at the time of the decedent's arrest. Specific to this case, it is excessive force, and thus a  clear violation of law, to put "substantial or significant pressure on a suspect's back while that suspect is

-13-

in a face-down prone position after being subdued." *Champion*, 380 F.3d at 903.  A reasonable officer would have known this type of conduct was unlawful. *Id*. at 903-04 (citing *Simpson v. Hines*, 903 F.2d 400 (5th Cir. 1990);  *Johnson v. City of Cincinnati*, 390 F. Supp. 2d 1013, 1019-20 (S.D. Ohio 1999); *Swans v. City of Lansing*, 65 F. Supp. 2d 625, 633-34 (W.D. Mich. 1998)).

(3) Evidence of Defendant Officers' Conduct as Objectively Unreasonable

Finally, Plaintiffs have proffered sufficient facts and evidence to show that Defendant Officers use of force was objectively unreasonable in light of the decedent's clearly established constitutional right.  Several times throughout the arrest, the decedent was face down on the ground with at least one if not more officers exerting full body pressure onto the decedent. Once handcuffed, the decedent remained face down lying on his stomach.  As stated previously, it was not until the decedent made a "gurgling sound" did Defendant Officers turn the decedent on his side to relieve him from the face down position. Plaintiffs have shown through the evidence that the decedent's injuries are consistent with death by asphyxiation. "Creating asphyxiating conditions by putting substantial [ ] pressure" on a handcuffed suspect's back is objectively unreasonable excessive force. *Champion*, 380 F.3d at 903. Thus, Plaintiffs have met all three requirements to overcome Defendants' qualified immunity. The court denies Defendants' motion on this basis.

### 2. Municipal Liability and Supervisory Liability

In Count Six, Plaintiffs assert that the City, Chief Lipton, Lt. Kopniske, and Sgt. Scarbrough "negligently and/or recklessly failed and/or neglected to adequately screen, interview, hire, train, supervise, test, investigate and/or discipline police personnel" and that this conduct was performed with "deliberate indifference" to the constitutional rights of the decedent and other similarly situated individuals. (Compl. )  In Count Ten, Plaintiffs assert that Defendants

-14-

Tieber, Semanco, Zimmerman, Novotny, Chief Lipton, Lt. Kopniske, and Sgt Scarbrough "violated [the decedent's] constitutional rights by failing to act or acting in a manner that failed to train, supervise, or control their subordinates." (*Id.*)  Because Counts Six and Ten draw upon similar allegations, the court will analyze these counts together. The court will analyze first the City's liability under the standard set forth in *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978). The court will then address the Individual Defendants' liability in their capacity as supervisors.

### a.  Municipal Liability for Federal Claims

The City, as a municipality, may not assert a qualified immunity defense against Plaintiffs' federal claims. The City, however, cannot be held vicariously liable for Defendant Officers' conduct, but can only be held liable for unconstitutional conduct attributable it.  *Powers v. Cnty. of Lorain*, 259 Fed. App'x 818, 821 (6th Cir. 2008).  To establish municipal liability, a plaintiff must meet one of several narrow theories that demonstrate the municipality's direct conduct in the deprivation of federal rights.   Under the official policy theory, a municipality can be held liable if Plaintiffs establish that their injuries were caused by an official policy attributable to the municipality.  *Monell,* 436 U.S. at 690.  An official policy is typically a formal rule or understanding, in writing, that  sets forth "fixed plans of action to be followed under similar circumstances consistently over time." *Pembaur*, 475 U.S. at 480-81.  A decision or action will be considered official policy of the municipality if it is promulgated by entities or officials who possess "final authority to establish municipal policy with respect to the action ordered," *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986), and  "whose acts or edicts may fairly be said to represent" the municipality,  *Monell*, 436 U.S. at 694.  Thus, a municipality will not be held liable for the unlawful conduct of an officer

who does not possess policy-making authority for the municipality unless his actions are pursuant to a policy of the municipality as discussed above. *Oklahoma City v. Tuttle*, 471 U.S. 808 (1985).

Additionally, a municipality can be held liable for a custom that causes a deprivation of federal rights, if the custom is based on "persistent and widespread discriminatory practices of state officials" that are "so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Monell*, 436 U.S. at 691 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68 (1970)). Unlike a governmental policy, a governmental custom does not need to receive formal approval by government decisionmakers to be attributable to a municipality. *Id.*

Finally, a municipality can be held liable under § 1983 for deprivations of federal rights stemming from the municipality's failure to train or supervise employees. Plaintiffs must show that: "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006). A municipality's conduct constitutes deliberate indifference when "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy [is] . . . likely to result in the violation of constitutional rights . . ." *City of Canton*, 489 U.S. at 390. A municipality's failure to train must be a "deliberate choice" made by the municipality as to effectively make this choice a "policy" attributable to the municipality. *Id.* at 389. Failure of the City to provide adequate training in light of foreseeable consequences will meet the deliberate indifference standard. *Brown v. Shaner*, 192 F.3d 927, 931 (6th Cir. 1999).

As stated above, Plaintiffs must first present sufficient evidence to show that the City's police training program is inadequate for the tasks that its officers must perform. Defendants contend that

there was no governmental policy or custom that caused Plaintiffs' injuries. (Mot. Summ. J., at 10.) Defendants assert that at the time of the decedent's death, all officers had either met or exceeded the State's requirements for initial and continuing training, including reviewing once a year the Use-Of-Force Policy. (*Id*.) Plaintiffs acknowledge that the City promulgated a Positional-Asphyxia Policy and a Use-Of-Force Policy that Defendant Officers had access to at the time of the decedent arrest. (Pls. Opp. at 16-17.) These Policies, on their face, set forth a governmental plan of action regarding the proper protocol relating to the excessive use of force and the dangers of asphyxiation. Notwithstanding these Policies, Plaintiffs assert the City was deliberately indifferent to rights of the decedent and others similarly situated because the officers required hands-on training to properly follow the Policies. Plaintiffs contend that reading the Policy without further training was not "appropriate and sufficient training," in light of the testimony of Tieber, Semanco, and Zimmerman who admitted that the policy never came to their minds when they restrained the decedent. (*Id*. (citing Pls. Opp. Appendix, ECF No. 54, Tieber Dep., Attach. 3, Semanco Dep., Attach. 4, Zimmerman Dep., Attach. 5).) Plaintiffs further rely on the statements of Dr. McCauley, retained as an expert witness for Plaintiffs, who opined in his 24-page report on the City's police practices and training, that the City's failures in training illustrated that the officers and City policy makers were "completely ignorant of reasonable options to avoid the use of force when confronted by" an emotional disturbed person like the decedent. ( Pls. Opp. Appendix, ECF No. 54, McCauley Aff., Attach. 2, at 16.) Dr. McCauley further stated that the City's decision not to implement an "Emotional Disturbed Person Policy," "reflects an administrative failure and an indifference to the safety of both police officers and citizens." (*Id*.) Based on Dr. McCauley's affidavit and the Defendant Officers' testimony, Plaintiffs have presented sufficient evidence to show that the training

program was inadequate to prepare the officers when they confronted the decedent. This also evidenced a finding in regard to prong three of our analysis – that the inadequacy in training  was closely related to the decedent's injuries.

Plaintiffs must now present  sufficient evidence under prong two to show that the City acted with deliberate indifference with respect to the decedent's constitutional rights.  The deliberate indifference standard is a "stringent standard of fact" that requires "proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011). As such, a municipality can not be held liable under a failure-to-train theory when the deficiencies in the training program stem from the negligent conduct of the municipality.  *City of Canton*, 489 U.S. at 391-92. Plaintiffs' evidence shows that while the Individual Defendant Officers could not recall  the Positional-Asphyxia Policy during their restraint of the decedent, the City had promulgated both  a Use-Of-Force and Positional-Asphyxia Policy and had facilitated some form of training as it pertains to both Policies.  The unsatisfactory training of particular officers or the occasional negligent administration  of an "otherwise sound program" is insufficient to show the City's deliberate indifference to the adequacy of its training program. *City of Canton*, 489 U.S. at 391. In other words, the City can not be held vicariously liable for an officer who, as the "bad apple" in the bunch, is solely responsible for the deprivation of federal rights. As such, the Individual Defendant Officers' testimony that they could not recall the policy when they restrained the decedent does not – by itself – establish that the City disregarded a "known or obvious consequence" as it pertains to the decedent's federal rights. Plaintiffs' strongest evidence to support a finding of deliberate indifference is Dr. McCauley's expert opinion that compares the standard practices for police department training in the area of positional asphyxiation to the training implemented by the

City's police department – reading the Policy out loud once a year. (*See* ECF No. 54, McCauley's Aff., Attach. 2, at 13.) As stated above, Dr. McCauley opined that the training provided by the City did not meet the accepted professional standards for police training with respect to positional asphyxiation and use of force against an emotional disturbed person. For example, Dr. McCauley stated that it was "not sufficient for a police department to merely issue a directive regarding compression/positional asphyxia and expect the officers to receive, understand, and practice the directives. . . . The officers must be taught and "learn" the meaning of the substance of the directives." (McCauley's Aff., at 16.)  Dr McCauley opined that the City's failure to properly train their officers was evident in the manner in which the officer used forced against the decedent who, naked and clearly unarmed, was exhibiting signs of an emotional disturbed person. (*Id*. at 12.) Dr. McCauley explained that a reasonably trained and competent police officer in those circumstances would have tried to de-escalate the situation through reasonable "intervention-calm conversation" before using high levels of force against the decedent. (*Id*.) Dr. McCauley opined that accepted police use-of-force practices would include training and a policy with respect to the restraint and arrest of emotional disturbed persons. He reasoned: "It was abundantly clear [Defendant] officers and the [City] policy maker were completely ignorant of reasonable options to avoid the use of force when confronted by an [emotional disturbed person]." (*Id*.) Dr. McCauley concluded that the City's failure to train its officers through accepted police administrative and operational practices reflected a deliberate indifference to the safe arrest of its citizens. This  evidence, when viewed in the light most favorable to Plaintiffs, falls within the limited circumstances in which a municipality is held liable for deprivations of federal rights due to their deliberate indifference in failing to train its officers.  As noted by the Supreme Court, these circumstances include when a municipality arms its

-19-

officers with firearms, knowing "to a moral certainty that their police officers will be required to arrest fleeing felons," and despite this knowledge, did not provide any training for the officers in using such force. *City of Canton*, 489 U.S. at 390, n. 10. Here, the City knew, as evidenced by the promulgation of its Policies, that its police officers would use force to restrain and arrest citizens, yet failed to follow accepted professional standards in training its officers of how to properly apply such force. Plaintiffs' evidence raises a genuine issue of material fact regarding the City's deliberate indifference to the decedent's rights. The City is not entitled to summary judgment on the claims against it.

In its Complaint, Plaintiffs allege that the City's failure to supervise and investigate Defendants Tieber and Semanco's use of force against not only the decedent, but also in other instances, is an additional basis for municipal liability. In making this argument, Plaintiffs rely heavily on the fact that the City never conducted a proper internal investigation regarding the use of force against the decedent, that the City has a pattern of failing to conduct systematic and complete internal affairs investigations regarding police complaints, and that the "causal" and "informal" process used by the City to address complaints is "grossly inadequate." (ECF No. 54, McCauly's Aff., Attach. 2, at 20-21.) Plaintiffs have not put forth evidence of a sufficient number and pattern of use-of-force incidents to establish that the failure to investigate the incident caused a violation of the decedent's rights in this case. *Compare Gomez v. Vernon*, 255 F.3d 1118, 1127 (9th Cir. 2001) (noting that a municipality could be held liable if it was "almost impossible for a police officer to suffer discipline as a result of a complaint lodged by a citizen").

**b. Supervisory Liability for Federal Claims**

-20-

A supervisor is not automatically liable for a constitutional violation committed by a subordinate. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1948 (2009). Defendants argue that Officer Novotny, Sgt. Scarbrough, and Lt. Kopniske had no involvement or supervisory role in the decedent's arrest; that Defendant Chief Lipton did not encourage or authorize any unconstitutional conduct committed against the decedent; and that Defendants Semanco, Zimmerman, and Novotny can not be held liable in a supervisory capacity under § 1983.

A supervisor may be liable for a §1983 violation if he or she "encourage[s] the specific incident of misconduct or in some other way directly participated in it or at least authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Leary v. Daeschner*, 228 F.3d 729, 740 (6th Cir. 2000) (internal quotation marks omitted). A supervisor's unlawful conduct must be more than having the right to control the employee or merely being aware of the conduct. *Id.* (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *Lillard v. Shelby Cnty. Bd. Of Educ.*, 76 F.3d 716, 728 (6th Cir. 1996)). "The mere right to control without any control or direction having been exercised and without any failure to supervise is not enough to support" a §1983 claim. *Monell*, 436 U.S. at 694, n. 58. Thus, this court must determine whether the supervisor's own conduct subjected the victim to the deprivation of a constitutional or federal statutory right.

In their brief supporting the summary judgment motion, Defendants argue that Novotny, Chief Lipton, Sgt. Scarbrough, and Lt. Kopniske had no contact with the decedent and did not supervise the Defendant Officers who did have contact with the decedent. (Mot. Summ. J., at 5.) Defendants rely on the declarations of Novotny, Sgt. Scarbrough, and Lt. Kopniske, all of which state that they either had no involvement with the decedent's arrest or possessed no supervisory duties during the

arrest. (*Id*., Attachs. 3, 6, and 7.) In their Opposition, Plaintiffs contend that these Defendants are not entitled to qualified immunity because they failed to enact appropriate policies, failed to adequately train, supervise, and/or discipline Defendant Tieber, Semanco, Zimmerman, and/or Novotny for their use of force against the decedent. (*See* Compl., ECF No. 1; Pls. Opp. , ECF No. 53.) Plaintiffs present evidence that there was never an internal investigation into the force used by Defendant Officers on the decedent; that there was no "hands-on" training for the City's Use-of-Force and Positional Asphyxia Policies. Plaintiffs assert that all three Defendants are liable for these failures due to their leadership positions within the Police Department. Defendant Chief Lipton is the Police Chief, Defendant Sgt. Scarbrough is the Department's sergeant in charge of facilitating the officer's training, and Defendant Lt. Kopniske's duties include investigating use-of-force incidents within the Department.

As indicated above, general allegations that officers were not properly supervised or trained are more appropriate evidence to support a failure-to-train claim against a municipality, not a claim against individual supervisors. *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009). To base an individual supervisor's liability on a failure-to-train theory "improperly conflates a § 1983 claim of individual supervisory liability with one of municipal liability." *Phillips v. Roane Cnty, Tenn.*, 534 F.3d 531, 543 (6th Cir. 2008) (internal quotation marks omitted). Plaintiffs must point to specific actions committed by the individual supervisors that suggest they had personal involvement with the underlying misconduct that caused the deprivation of the decedent. *Id*. (finding that the plaintiff did not present evidence to support a finding that the supervisors were personally involved in the shooting of the plaintiff). In their Opposition, Plaintiffs do not set forth specific facts that show Lipton, Kopniske, and Scarbrough were personally involved with the deprivation of the decedent's

-22-

rights.  Instead, Plaintiffs' arguments address facts that support a finding that the City failed to adequately train, supervise, or investigate its officers' conduct.  Because Plaintiffs can not establish supervisory liability for Defendants Lipton, Kopniske, and Scarbrough, these Defendants are entitled to qualified immunity and a grant of summary judgment in their favor.

Defendants argue that Defendant Novotny did not supervise the Defendant Officers the night of the decedent's arrest. (*See* Reply Mot. Summ. J., at 2.)  Plaintiffs contend that Defendant Novotny is not entitled to qualified immunity because, as the Officer in Charge, he left the scene of the arrest "without ordering Tieber  and Zimmerman to roll [the decedent] on to his side or place him in a sitting position." (Pls. Opp. , ECF No. 53, at 12.) In his deposition, Defendant Novotny testified that, as Officer in Charge, he was the "senior officer on the road at the time" and  responsible for picking up warrants, finding substitutes for sick police officers on duty, giving on duty police officers "parking permission", and contacting a supervisor if needed. (ECF No. 55, Attach. 2.) He testified further that at the time of the decedent's arrest he did not have any "supervisory duties". (*Id.*) Even if Plaintiffs have shown that Novotny possessed supervisory duties during  the arrest of the decedent, Plaintiffs have not presented evidence showing that Defendant Novotny implicitly authorized or knowingly acquiescence in the deprivation of the decedent's rights. At best, Plaintiffs evidence shows that Novotny failed to act in ordering the other Officers to roll the decedent on his side. A "mere failure to act" does not rise to the level of conduct that renders Novotny liable in a supervisory capacity. *Gregory v. City of Louiseville*, 444 F.3d 725, 751 (6th Cir. 2006) (internal quotation marks omitted). The court grants Defendants' motion as it pertains to Officer Novotny.

### 3. Summary Judgment Regarding Federal Claims

For the reasons stated above, the court grants in part and denies in part Defendants' motion for summary judgment of Plaintiffs' federal claims. (ECF No. 51.) Defendant Novotny is entitled to qualified immunity on all counts against him including Counts Three, Four, and Ten. Defendants Tieber, Semanco, and Zimmerman are entitled to qualified immunity on Counts Four and Ten, but not Three.  Defendants Lipton, Kopniske, and Scarbrough are entitled to qualified immunity on Counts Six and Ten.  The court denies summary judgment for the City on all claims against it.

### B. State Law Claims

Plaintiffs plead seven state claims against Defendants: (1) assault [count one]; (2) battery [count two]; (3) survivorship [count twelve]; (4) negligence [count five]; (5) wrongful death [count eleven]; (6) loss of consortium [count seven]; and  (7) infliction of emotional distress [count nine]. (Compl. ) Defendants move for summary judgment on all state claims. (Mot. Summ. Judgment.) Defendants argue that they are entitled to statutory immunity, and further, that Plaintiffs' claims fail on their merits. The court will address each argument in turn.

### 1. Statutory Immunity

Under Ohio Revised Code § 2744.02(A)(1), an Ohio political division is not liable for damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of a political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function.  Subsection (B) of § 2744.02 sets forth exceptions to this statutory immunity which creates liability for a political division for acts including negligent operation of a motor vehicle and negligent performance of acts with respect to proprietary functions. *See* (B)(1) and (2).

-24-

Ohio law also immunizes employees of political divisions. Section 2744.03 (A)(6) of the Ohio Revised Code provides immunity for an employee of a political subdivision unless:

> (a) The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities;
> (b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner;
> (c) Civil liability is expressly imposed upon the employee by a section of the Revised Code . . .

O.R.C. § 2744.03(A)(6).

Defendants contend that all Defendants are entitled to statutory immunity under O.R.C. §§ 2744.02 and 2744.03. The court finds that Defendants are entitled to statutory immunity for the following state claims to the extent these claims are based on negligent conduct: Count Five, negligence; Count Nine, infliction of emotional distress; and Count Eleven, Wrongful Death. In their Opposition, Plaintiffs do not contest the City's immunity under § 2744.02, but argue that the Individual Defendants fall under §2744.03(b) exception – acts or omissions made with malicious purpose, in bad faith, or in a wanton or reckless manner. Under this exception, "malice" is "the willful and intentional design to do injury", "bad faith" is "conduct that involves a dishonest purpose, conscious wrongdoing, the breach of a known duty through some ulterior motive", and "wanton or reckless" is "misconduct that comprehends an entire absence of all care for the safety of others and an indifference to consequences." *Valentino v. Bd. of Ed. Wickliffe City Sch. Dist.*, Nos. 2009-L-083, 2009-L-089, 2010 WL 4621818, *5 (Ohio Ct. App. Nov. 12, 2010). Given the facts of this case, Plaintiffs' evidence supporting a finding of § 1983 liability also supports a finding of bad faith, malice, or reckless behavior for purposes of § 2744.03(b) liability. *See Cline v. Cty of Mansfield*, 745 F. Supp. 2d 773, 840 (N.D. Ohio 2010) (finding that under the facts of the case, the "state law immunity analysis is not distinguishable from the analysis of qualified immunity.") Thus, there is

a genuine issue of material fact as to whether Defendants Tieber, Semanco, and Zimmerman acted with "malicious purpose, in bad faith, or in a wanton or reckless manner" in their restraint of the decedent. When viewing this evidence in a light most favorable to Plaintiffs, a reasonable jury could conclude that Tieber, Semanco, and Zimmerman acted with malice, bad faith, or recklessly when they restrained and applied their combined weights on the emotionally-disturbed decedent while he lied face down. Accordingly, Defendants Tieber, Semanco, and Zimmerman are not entitled to statutory immunity.  Further, based on the same facts, Plaintiffs have not presented evidence that Defendants Novotny, Lipton, Kopniske, and Scarbrough acted with malice, bad faith, or recklessly with regard to the decedent and as such, these Defendants are entitled to statutory immunity on the state claims.

### 2. Merits of the Claims

Defendants contend that even if Defendants are not entitled to immunity,  Plaintiffs' state law claims should be dismissed on the merits. Plaintiffs respond that each state claim raises a genuine issue of material fact sufficient to defeat summary judgment.

### a. Counts One, Two, and Twelve: Assault, Battery, and Survivorship

Plaintiffs bring assault and battery claims against Defendants Tieber, Semanco, Zimmerman, and Novotny. Plaintiffs' survivorship claim is against all Defendants.

To establish an assault claim, a plaintiff must show that the defendant wilfully threatened or attempted to harm or touch another offensively and that this threat or attempt to harm  reasonably placed the other in fear of such contract. *Retter v. Whirlpool Corp*., 677 N.E.2d 417, 421-22 (Ohio 1996) (*abrogated for other grounds by* Byrd v. Smith, 850 N.E.2d 47 (Ohio 2006)) . For a battery claim, a plaintiff must show that the defendant acted with intent to cause a harmful or offensive

contact, and that harmful or offensive contact occurred. *Love v. Port Clinton*, 524 N.E.2d 166, 167 (Ohio 1988).

Finally, a claim for survivorship is a claim for the injuries that the decedent suffered while he was still alive. *May Coal Co. v. Robinette*, 165 N.E. 576, 577 (Ohio 1929). Because a claim for survivorship is a derivative of Plaintiffs' principal claims, Plaintiffs may maintain this claim "so long as any of the underlying principal claims" remain. *Stratford v. SmithKline Beecham Corp.*, No. 2:07-CV-639, 2008 WL 2491965, *9 (S.D. Ohio June 17, 2008).

Plaintiffs' have proffered evidence that raises a genuine issue of material fact regarding whether Defendants Tieber, Semanco, and Zimmerman committed an assault and battery during their arrest of the decedent.  Defendant Officers testified that they all held down a portion of the decedent's body to prevent him from moving. Further, Defendants Tieber and Semanco testified that they struck and/or hit the decedent a number of times during the arrest. Based on this evidence, a reasonable jury could find Defendants Tieber, Semanco, and Zimmerman liable for assault and battery, and also, a claim for survivorship for the injuries sustained by the decedent during both torts.

Finally, Defendants argue that Plaintiffs' assault, battery, and survivorship claims should be dismissed because Defendants were privileged to commit the injuries sustained by the decedent. (Mot. Summ. Judgment.) To support their argument, Defendants cite to *Alley v. Bettencout*, 730 N.E.2d 1067, 1073 (Ohio 1999), a state court of appeals decision that addressed an officer's privilege to commit battery when making a lawful arrest, but stated that "the privilege is negated by [the officer's] use of excessive force." *Id*. The *Alley* decision does not support Defendants' argument. Plaintiffs have presented evidence of Defendants' excessive force to overcome summary judgment

-27-

for Defendants Tieber, Semanco, and Zimmerman and thus Defendants are not entitled to privilege under the *Alley* decision.

### b. Count Eleven:  Wrongful Death

Defendants contend that Plaintiffs' wrongful death claim should be dismissed because Plaintiffs can not prove that Defendants' breached a duty owed to the decedent. (Mot. Summ. Judgment.)  Plaintiffs argue that their wrongful death claim is based in part on Defendants' "reckless, willful, wanton, malicious, bad faith and/or other tortious conduct." (*Id.*) To support their wrongful death claim, Plaintiffs present the same facts that supported Defendants' liability under § 1983. (*Id.*) Based on these facts, Plaintiffs have offered sufficient evidence of conduct that a reasonable jury could determine was reckless, wanton, or in bad faith committed by  Defendants Tieber, Semanco, and Zimmerman. *See Sabor v. City of Mentor*, 1:10-CV-345, 2010 WL 4008823, at *9 (N.D. Ohio 2010) (denying summary judgment on the plaintiff's wrongful death claim and Fourth Amendment excessive force claim based on the same triable fact – whether the officer acted unlawfully when he shoot the plaintiff); *Stephens v. City of Akron*, 729 F. Supp. 2d 945, 965 (N.D. Ohio 2010) ("The factual disputes that preclude summary judgment on Plaintiff's § 1983 claims against the officers likewise prevent summary judgment on the state law claims.").  Because Plaintiffs have shown that there remains a genuine issue of material fact regarding whether Defendants Tieber, Semanco, and Zimmerman acted recklessly when they restrained the decedent in a prone position, the court denies Defendants' motion for summary judgment on Count Eleven against the above named Defendants.

### c. Count Seven: Loss of Consortium

Defendants argue that Plaintiffs' loss-of-consortium claim should be dismissed because under state law a parent can not maintain this type of action for the injury or death of an adult child.  The Ohio Supreme Court has yet to determine whether a parent can bring a loss-of-consortium action for the death  of an adult child. *See Brady v. Miller*, No. 19723, 2003 WL 22025969, at *4 (Ohio Ct. App. Aug. 29, 2003) ("[T]he Ohio Supreme Court has not specifically addressed . . . whether parents may recover for the loss of filial consortium  for an injured adult child.")

When the Ohio Supreme Court has not decided an issue, a federal court should accord weight to the decisions of the state appellate courts. *Bailey v. V&O Press Co.*, 770 F.2d 601, 604 (6th Cir. 1985). State appellate court decisions are not binding if the federal court is "convinced by other data that the state's highest court would determine otherwise." *Id.*

Plaintiffs contend that the Ohio common law has expanded to now recognize a loss of consortium claim by a parent for the loss of an adult or emancipated child.  Plaintiffs cite two state cases, *Rolf v. Tri State Motor Transit Co.*,745 N.E.2d 424 (Ohio 2001), and *Brady v. Miller*, No. 19723, 2003 WL 22025969 (Ohio Ct. App. Aug. 29, 2003), to support their contention. In *Rolf*, the Ohio Supreme Court held that adult emancipated children could recover loss of consortium for injuries sustained to a parent. 745 N.E.2d 424. *Brady*, an Ohio court of appeals decision, held that a parent could recover for loss of filial consortium for injuries sustained by an emancipated adult child. 2003 WL 22025969 at *4. Plaintiffs ask this court to find the *Brady* decision controlling.  The *Brady* court based its decision on two factors. *Id.* First, the *Brady* court  recognized that in recent years, Ohio loss-of-consortium claims have expanded to give standing to three types of loss-of-consortium cases: (1) a *minor* child for the loss of parental consortium; (2) a parent for the loss of filial consortium for injury; and (3) an emancipated adult child for the loss of parental consortium.

-29-

*Id*. Second, the *Brady* court looked at the rationale underlying the expansion of the loss-of-consortium claim, namely, that the claim remedies "a loss of society, companionship, comfort, love, and solace between parent and child." *Id*. (citing *Gallimore v. Childrens Hops. Med. Ctr.*, 617 N.E.2d 1052 (Ohio 1993)). Quoting the Ohio Supreme Court case *Rolf*, the *Brady* court noted:

> Surely nature recoils from the suggestions that the society, companionship and love which compose of filial consortium automatically fade upon emancipation [of the child] . . . to suggest as a matter of law that compensable consortium begins at birth and ends at age eighteen is illogical and inconsistent with common sense and experience.

*Id*. at *5 (quoting *Rolf*, 745 N.E.2d at 427). Based on Ohio Supreme Court precedent, the *Brady* court found it "irrational" to deny a parent loss of filial consortium for an emancipated adult child's injuries, and thus upheld the claim. *Id*. at *5.

Defendants cite another state court of appeals decision, *Cole et al. v. Broomsticks, Inc.*, 669 N.E.2d 253 (Ohio Ct. App., 1995), that denied a parent's loss of filial consortium for injuries sustained by an adult child.   Written before the *Rolf* decision, the *Cole* court reasoned that only a minor, not adult, child can be the basis for a loss-of-filial-consortium claim because "parents bear a natural and legal burden of care for minor children, but not for adult children." *Id*. at 577.

The court finds the *Brady* decision more persuasive and aligned with the dicta found in *Rolf* regarding the policy rationale of a loss-of-consortium claim. Thus, Plaintiffs can maintain a loss-of-consortium claim for the injuries sustained by the decedent.

A loss-of-consortium claim is a derivative of the injured child's cause of action. *Wilson v. Columbus Bd. of Educ.*, 589 F. Supp. 2d 952, 971-72 (S.D. Ohio 2008) (citing *Gallimore*, 617 N.E.2d 1052).  The purpose of this claim is to compensate the parent for the enjoyment and companionship lost due to the injury or death of a child. *See Rolf*, 745 N.E.2d at 426.  Plaintiffs have offered

sufficient evidence that there remains a genuine issue of material fact regarding Defendants' liability for the injuries sustained by her son, the decedent, during his arrest, and thus, her loss of consortium claim.

For these reasons, the court denies Defendants' motion for summary judgment of Count Seven. Plaintiffs may bring a loss of consortium claim for the loss of her son, the decedent against Defendants Tieber, Semanco, and Zimmerman.

### d. Count Nine: Infliction of Emotional Distress

In their complaint, Plaintiffs plead infliction of emotion distress under a negligence and intentional tort theory. Defendants contend that both theories fails and that Count Nine should not survive summary judgment. First, Defendants argue that they possess statutory immunity for all mere negligence claims including, negligent infliction of emotional distress. *See* O.R.C. §2744.03. As stated above, the court agrees that state actors are immune from suit for negligence claims.[4] The court notes that Plaintiffs did not contest this argument in their opposition brief. Second, Defendants argue that Plaintiffs have not shown Defendants' conduct meets a claim for intentional infliction of emotional distress. To establish this claim, a plaintiff must show:

> (1) the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff; (2) the actor's conduct was so extreme as to go beyond all possible bounds of decency and was such that it can be considered utterly intolerable in a civilized community; (3) the actor's actions were the proximate cause of plaintiff's psychic injury; and (4) the mental anguish

---

[4]    Defendants also argue that even Plaintiffs' negligent infliction-of-emotional-distress claim would fail on the merits because Plaintiffs have not shown that they "either witnessed or experienced a dangerous accident or appreciated the actual physical peril." Because Defendants have immunity for this negligence claim, the court does not need to address the merits of the claim.

suffered by plaintiff is serious and of a nature that no reasonable person could
be expected to endure it.

*Garcia v. ANR Freight Sys., Inc.*, 942 F. Supp. 351, 359 (N.D. Ohio 1996) (citing *Tschantz v. Ferguson*, 647 N.E.2d 507, 513 (Ohio Ct. App. 1994)).

To show conduct "so extreme as to go beyond all possible bounds of decency . . . [i]t has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he had intended to inflict emotional distress, or . . . that his conduct has been characterized by 'malice'." *Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen & Helpers of America*, 6 Ohio St.3d 369, 374-75 (Ohio 1983), *abrogated by*, *Welling v. Weinfeld*, 866 N.E.2d 1051 (Ohio 2007)[5] (quoting Restatement (Second) of Torts §46 cmt d (1965)). Because Ohio law gives a narrow definition for this extreme conduct, a *prima facie* case of intentional infliction of emotional distress is extremely difficult to show. *See Bolander v. BP Oil. Co.*, 128 F. App'x. 412, 419 (6th Cir. 2005) ("To say that Ohio courts narrowly define 'extreme and outrageous conduct' would be something of an understatement." (quoting *Baab v. AMR Services Corp.*, 811 F. Supp. 1246, 1269 (N.D. Ohio 1993)).

Because the standard for intentional infliction of emotional distress is so narrow, Plaintiffs have not offered sufficient evidence for their claim to survive on summary judgment. While Defendant Officers conduct may constitute excessive force, a battery, and assault, and thus was unreasonable and even reckless, their restraint of the decedent was not so "utterly intolerable in a civilized community." The court grants Defendants' motion for summary judgment on this claim.

---

[5]     Although *Yeager* has been abrogated by *Welling*, *Welling* does not abrogate the proposition regarding intentional infliction of emotional distress. *See also*, *Hill v. Airtran Airways, Inc.*, No. 3:08 CV 195, 2009 WL 1850194 (S.D. Ohio June 19, 2009).

### 3. Summary Judgment regarding State Claims

For the reasons stated above, the court grants in part and denies in part Defendants' motion for summary judgment of Plaintiffs' state claims. Defendants Novotny, the City, Lipton, Scarbrough, and Kopniske are entitled to statutory immunity on all counts against them. The court denies summary judgment against all other Defendants who are not entitled to immunity on Counts One, Two, Seven, Nine, Eleven, and Twelve. Finally, the court grants summary judgment in favor of Defendants on Count Five, and to the extent these claims are based on negligence, Counts Nine and Eleven.

### C. Punitive Damages

Defendants argue that Count Thirteen, entitlements to punitive damages, is not a separate cause of action. Plaintiffs do not address Defendants' argument against punitive damages in their opposition. In order to grant summary judgment, Defendants, as the moving party, have the initial burden of showing the absence of any genuine issues of material fact.

Punitive damages can be a separate cause of action in a federal civil rights action and thus are not barred as a matter of law. *Smith v. Wade*, 461 U.S. 30, 56 (1983). Punitive damages can not be awarded against a municipality. *City of Newport v. Fact Concerts*, 453 U.S. 247 (1981). The standard for punitive damages is whether Defendants acted with an "evil motive or intent" or "reckless or callous indifference" to Plaintiffs' rights. *See Smith*, 461 U.S. at 56. Punitive damages have been upheld or awarded in a §1983 action where the police officers were also found liable for assault and battery, *Koehler v. Smith*, 124 F.3d 198 (Table), No. 96-1595, 1997 WL 595085 at *7 (6th Cir. September 15, 1997) ("[A] defendant police officer who uses force 'wantonly or maliciously' or with 'reckless indifference' will be found liable for assault and battery, while under

§1983, that same conduct will subject the officer to punitive damages."), where prison guards violated a prisoner's Eighth Amendment rights by acting with "deliberate indifference" toward the stabbing of that prisoner, *Walker v. Norris*, 917 F.2d 1449, 1459-60 (6th Cir. 1990) (upholding a punitive damage award against the defendant prisoner guards because the court gave the proper jury instruction that, in order to award punitive damages, defendants' conduct must be motivated by evil motive or intent), and where officers "acted in a malicious and oppressive manner" by striking several suspects, including both kicking one male suspect in the groin and hitting the same male suspect over the head. *Lewis v. Downs*, 774 F.2d 711, 711-14 (6th Cir. 1985) (upholding a district court's award of punitive damages against the defendant officers). Further, under Ohio law, Plaintiffs can seek punitive damages if they show that Defendants conduct "is aggravated by the existence of malice or ill will, or that the wrongdoing was particularly gross or egregious." *Mid-America Acceptance Co. v. Lightle*, 570 N.E.2d 721, 729 (Ohio Ct. App. 1989) (internal quotation marks omitted).

Because Plaintiffs can bring punitive damages as a separate cause of action, Defendants have not met their burden to show there is no genuine issue of material fact regarding Count Thirteen. Defendants' motion for summary judgment is denied.

## V. CONCLUSION

The court hereby grants in part and denies in part Defendants' motion for summary judgment. (ECF No. 51.) The court grants summary judgment in favor of Defendants for Counts Four, Five, Eight, Nine to the extent the claim is based on negligence, Ten, and Eleven, to the extent the claim is based on negligence. The court grants summary judgment in favor of Defendant Novotny for all counts against him, which are Counts One, Two, Three, Four, Seven, Eleven, Twelve, and Thirteen.

-34-

Pertaining to Defendants Tieber, Semanco, and Zimmerman, the court denies summary judgment on Counts One, Two, Three, Nine, Eleven, Twelve, and Thirteen, and grants summary judgment in their favor on Counts Four.  Pertaining to Defendants Lipton, Kopniske, and Scarbrough, the court grants summary judgment in their favor on all counts pled against them.  Pertaining to the City, the court denies summary judgment on Counts Six and Thirteen and grants summary judgment in its favor on all other counts pled against it.

   IT IS SO ORDERED.

          /s/ *SOLOMON OLIVER, JR.*
          CHIEF JUDGE
          UNITED STATES DISTRICT JUDGE

August 18, 2011